UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| MICHAEL OVERTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| OFFICER ROBERT HICKS, individually | ) | |
| and as a deputy for the Marion County | ) | |
| Sheriff's Department, OFFICER BRADLEY | ) | CASE NO. 1:06-cv-1513-DFH-JMS |
| BEATON, individually and as a deputy for | ) | |
| the Marion County Sheriff's Department, | ) | |
| OFFICER MARK PARKER, individually | ) | |
| and as a police officer for the City of | ) | |
| Beech Grove, MARION COUNTY | ) | |
| SHERIFF, and CITY OF BEECH GROVE, | ) | |
| | ) | |
| Defendants. | ) | |

ENTRY ON INDIANAPOLIS DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

Plaintiff Michael Overton, a diabetic, has sued Officers Robert Hicks and

Bradley Beaton of the Marion County Sheriff's Department under 42 U.S.C.

§ 1983 based on alleged Fourth Amendment violations and has sued the Marion

County Sheriff's Department on parallel tort claims under state law.  Overton also

claims that the Marion County Sheriff, based on Officer Beaton's conduct,

discriminated against him under the Americans with Disabilities Act of 1990,

42 U.S.C. § 12132, because of his diabetic condition.  Overton's claims stem from

an arrest effected by Officers Hicks and Beaton after Overton sideswiped another

car before lodging his own car on a curb late one night.   Overton was

hypoglycemic at the time.  He claims that the officers used excessive force against him, falsely arrested and maliciously prosecuted him, and discriminated against him as a diabetic.  The Marion County defendants moved for summary judgment on all claims and asserted qualified immunity for Officer Beaton on Overton's Fourth Amendment malicious prosecution claim.

As explained below, the claims that survive summary judgment are:  (1) the federal excessive force claim against Officer Beaton for allegedly tackling Overton and for failing to intervene while a police dog attacked Overton as he was lying handcuffed on the ground; (2) the state law battery claim against the Marion County Sheriff for Officer Beaton's alleged tackling; (3) the federal and state law false arrest claims against Officer Beaton; and (4) the federal malicious prosecution claim against Officer Beaton.  Officer Beaton has asserted qualified immunity only for the malicious prosecution claim and is not entitled to immunity for that claim.

*Summary Judgment Standard*

Summary judgment must be granted if the record shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A factual issue is genuine if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party.  See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A

factual issue is material if resolving the factual issue might change the suit's outcome under the governing law.  *Id.*  The motion should be granted only if no rational fact finder could return a verdict in favor of the non-moving party.  *Id.* at 249.

When ruling on the motion, the court must view all the evidence in the record in the light most favorable to the non-moving party and must resolve all factual disputes in the non-moving party's favor.  See *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000).  The moving party need not positively disprove the opponent's case; rather, the moving party must establish the lack of evidentiary support for the non-moving party's position.  See *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  The essential question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

## Facts for Summary Judgment

The following statement of facts is not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light reasonably most favorable to plaintiff Michael Overton, the non-moving party.  *Reeves*, 530 U.S. at 150.

On September 1, 2005, Michael Overton went to his second job at the United Postal Service ("UPS") around 5:45 p.m. and worked until around 10:30 p.m. After work, Overton and Ray Gomez, a friend and co-worker, went to a pub on the south side of Indianapolis. The two drove separately. Overton, who is diabetic, drank two diet sodas and did not have anything to eat. He had eaten a sandwich before working at UPS and had a snack of peanut butter crackers during his break at 7:30 p.m. A little before midnight, Overton told Gomez that he was tired and was going home. The pub was on U.S. Route 31. Overton's apartment was also on U.S. Route 31, north of the pub. Overton left the parking lot feeling fine and turned to head north on U.S. Route 31. Sometime shortly after leaving the parking lot, "everything got cloudy" for him. Overton Dep. 28.

According to eyewitnesses, Overton somehow made his way over to Madison Avenue – another next north-south thoroughfare just east of U.S. Route 31 – a little after midnight. Pl. Ex. 12 at 3-4. Madison Avenue had two northbound lanes and two southbound lanes, separated by a center turn lane. Michael Richards was driving south on Madison. Just north of the intersection of Madison Avenue and Banta Road, Richards saw Overton driving north in the eastern southbound lane. Richards swerved to avoid hitting Overton, but Overton still sideswiped the driver's side of Richards' car.

After hitting Richards' car, Overton continued driving north on Madison. One eyewitness, Neil Copley, called 911 to report the hit-and-run accident. *Id.*

Three occupants of another car traveling north on Madison saw Overton swerving and driving on the wrong side of the street, and they also called 911.  Messer Aff. ¶¶ 2-5; McClure Aff. ¶¶ 2-4.  Officer Bradley Beaton of the Marion County Sheriff's Department was a few blocks away when he heard the dispatch on his radio. Beaton Dep. 8.  He made his way over to Madison Avenue, pulled his car behind Overton's car, and turned his lights and siren on.  *Id.* at 9.  By this time, both tires on the driver's side of Overton's car were flat and his car was not moving very fast.  *Id.* at 10.  Overton did not stop.  After Overton and Beaton passed through the next main intersection of Madison and Edgewood Avenues, Overton steered his car slightly to the right and then made an abrupt left-hand turn.  *Id.* at 11. Overton's car got stuck on the western curb of Madison Avenue.

Officer Beaton parked his car about ten feet behind Overton's car, turned on his spotlight to shine inside of Overton's car, got out of his own car, and yelled at Overton to show his hands.  *Id.* at 12-14.  According to Beaton, Overton was revving his engine and moving his hand near the steering column as though he was trying to put the car into reverse.  *Id.* at 14.  Beaton also thought that the spotlight seemed to blind Overton because he kept moving his head while attempting to look into his rear and side-view mirrors.  *Id.* at 20.  Beaton drew his gun.  By this time, as many as five other officers had arrived and surrounded the car.  *Id.* at 16; McClure Aff. ¶¶ 7-8; Messer Aff. ¶¶ 8-10.  Overton's window was down.  According to Officer Parker from the Beech Grove Police Department, Overton's left arm was hanging down out of his window.  Parker Dep. 20.  Several

officers were shouting at Overton to get out of the car.  Beaton Dep. 18.  Overton made no apparent response.  Messer Aff. ¶ 11.

Officer Parker then approached Overton with his police dog.  Parker told Overton that he would use his dog if Overton did not get out of the car.  Overton did not get out of the car and was still continuing to try to look in his mirrors. Beaton Dep. 20-21.  Parker asked Beaton to "cover" Overton with his gun.  *Id.* at 23.  Officer Hicks from the Marion County Sheriff's Department also had his gun trained on Overton.  *Id.*  Parker ordered his dog to bite Overton's left arm as it hung out the window.  Parker Dep. 22-23.  When the dog bit, Overton tried to pull his arm inside the car.  According to Beaton, Parker then opened the driver's side door and told Overton that he would use his dog again if Overton did not get out of the car.  Beaton Dep. 23-24.  Overton did not comply.  *Id.*

Parker ordered his dog to bite Overton's left hip.  Parker Dep. 29.  Parker then pulled on the dog's leash while the dog was biting Overton's leg in an attempt to pull Overton out of the car.  According to Parker, as Overton was being dragged out of the car, he grabbed the steering wheel with his right hand and began hitting the dog with his left hand.  Parker Dep. 33.  According to Officer Beaton, Overton began hitting the dog with one hand and grabbed something in the driver's seat with his other hand.  Beaton Dep. 24-25.[1]  According to Officer Hicks, Overton

---

[1]Beaton did not describe what he thought he saw Overton trying to grab. Overton testified that he always kept a small, brown bag with his diabetic
(continued...)

grabbed the steering wheel tightly and did not grab anything from inside the car, but the dog did not bite Overton.   Hicks Dep. 8.   For purposes of summary judgment, the court accepts as true Officer Parker's testimony here – that the dog bit Overton and that Overton fought back only with his hands.

Officer Hicks told Overton that if he did not get out of the car, Hicks would "tase" him.   Hicks Dep. 10.   Parker then pulled the dog off of Overton and "at about the same time," Officer Hicks shot the taser probes at Overton's chest. Beaton Dep. 27; see also Parker Dep. 39.   When Hicks "tased" Overton, Overton's hands were on the steering wheel and he was sitting facing the front windshield. Hicks Dep. 10-11.   According to Hicks, for some reason, the probes did not attach to Overton's chest.   Hicks Dep. 11-12; see also Hicks Dep. Ex. 6 at 2.   Hicks estimated that Overton received "about a one-second burst" of electricity.   Hicks Dep. 12.   Beaton remembered the probes staying in Overton's chest for at least five seconds.   Beaton Dep. 26-27.   For purposes of summary judgment, the court accepts as true Officer Beaton's testimony on this point – that the probes delivered a shock for at least five seconds.

After being shocked, Overton got out of his car, took a couple of steps away from the car, and looked "dazed and semiconscious."   Messer Aff.   ¶¶14-15; see also Hicks Dep. 12.   According to civilian witness Messer, it "looked like there was

---

[1](...continued)
medicine and equipment in the front seat of his car.   Overton Dep. 78-80.

something wrong with him."  Messer Aff. ¶ 16.  According to civilian witness McClure, "he just stood in the road and seemed like he didn't know what was going on."  McClure Aff. ¶ 14.

Once Overton was out of the car and standing in the street, several officers yelled at him to get down on the ground.  Beaton Dep. 29.  According to Officer Beaton, Overton positioned himself in a fighting stance outside his car.  *Id.* at 31.  According to Officer Hicks, Overton "had his hands up a little bit," but Hicks did not remember Overton clenching his hands into fists.  Hicks Dep. 14.  Messer, however, described Overton's behavior as mild:

> The man did not take any kind of aggressive or "fighting stance," against the police officers and did not appear to present any threat.  It looked like he was not even aware of what was going on.  The man's hands were down by his side, and it did not look like his hands were in fists.  He definitely [w]as not being aggressive towards anybody.

Messer Aff. ¶¶ 17-18.  At the summary judgment stage, of course, the court must accept the version most favorable to plaintiff Overton – that he seemed dazed and was not acting in an aggressive or threatening manner toward anyone.

As Overton was standing looking dazed, Officer Beaton tackled him from behind.  Beaton pinned Overton's arms to his sides "[s]lightly above his elbows."  Beaton Dep. 33-34.  The two landed on the ground face first with Beaton's forearms under Overton and his body weight keeping Overton down.  *Id.*  Overton tried to pull his arms out, but the officers pulled Overton's arms behind him and

cuffed him.  Beaton Dep. 35; Hicks Dep. 14-15.  The officers left Overton on the

ground.   Because the dog had bitten him and Officer Hicks had "tased" him,

someone called an ambulance.  Overton remained handcuffed on the ground until

the paramedics arrived.  Someone gave him a breathalyzer test, which showed no

alcohol in Overton's system.  Beaton Dep. 62; Pl. Ex. 9 at 3.

Overton does not remember most of what happened in between leaving the

pub's parking lot and finding himself in an ambulance.  He described the few

memories he had of the intervening events as somewhat dreamlike:

> I remember coming to a stop.  I remember seeing lights, but it was like it
> was surreal.  The next thing I knew I was standing out in the middle of the
> street, and I remember being on the ground.  I remember something, at that
> time, gnawing at the back of my pants.  After that happened the paramedics
> came.  There was an officer.  I don't know if it was an officer.  Somebody
> told me to blow into this straw.  I kept saying I had a medical condition.

Overton Dep. 29-30.  His blood sugar had fallen to a level of 53 milligrams per

deciliter.  Def. Ex. H.  Around 12:30 a.m., the paramedics gave Overton glucose

paste – a liquid sugar given to quickly treat low blood sugar.  *Id.*  His blood sugar

level fell to 34 milligrams per deciliter.  *Id.*  The paramedics put Overton on an IV

and gave him dextrose – a simple sugar.  *Id.*

Overton distinctly remembered coming to in the ambulance and realized

that he was "lying flat in the ambulance being handcuffed to the railing."  Overton

Dep. 37-38.  He asked Officer Hicks, who was riding in the ambulance, why he

was handcuffed.  Hicks told him, "I don't want you to go anywhere."  *Id.* at 30.  Overton's arms were hurting, and he asked Hicks to loosen the cuffs.  *Id.* at 38, 89.  Hicks loosened the cuffs.  At the hospital, Overton's hands and legs were cuffed while lying on a bed in the hospital's detention unit.  The hospital staff treated his dog bites and low blood sugar.  When Overton complained that his arms hurt, he was given a pill.  *Id.* at 41, 67.

Overton was released from the hospital at 3:20 a.m. and taken to the Arrestee Processing Center for booking.  The pain in his arms made it difficult to take his fingerprints.  It took two or three tries to take a usable set.  *Id.* at 85.  Overton complained about the pain and received one sandwich bag full of ice in response.  He rotated the bag between his arms until it melted.  *Id.* at 85-86.  After being released from jail and sleeping some, he called his ex-wife to drive him to another hospital.  Doctors there diagnosed breaks in bones in both of Overton's forearms.

Despite knowing that Overton was diabetic and had low blood sugar the night of the accident, Officer Beaton charged him with two counts of resisting law enforcement and one count of fleeing the scene of an accident.  Probable Cause Aff. 1.  Beaton testified that the female paramedic treating Overton had stated that his blood sugar was low but not "low enough that he wouldn't know what's going on."  Beaton Dep. 39.  The female paramedic who treated Overton said she does not remember telling "any officer that Mr. Overton's blood sugar was not so low

that he would not be cooperative," and she does not believe that she would have made such a statement because of patient privacy.   James Aff. ¶¶ 11, 13.   A female emergency medical technician who was present but did not treat Overton does not remember if the paramedic said anything to the police about Overton's blood sugar level.   Stevens Aff. ¶¶ 4-5.   The patient sharing a room with Overton at the original hospital remembers that he was "pretty messed-up physically, and that he was still somewhat incoherent" even after being treated for hypoglycemia. Blair Aff. ¶ 6.   Overton appeared in six court proceedings before the prosecutor dismissed the charges on June 1, 2006, because Overton had a "Good Defense." Pl. Ex. 10; Overton Dep. 44-45, 92.

Overton filed this suit on October 16, 2006, alleging violations of the Fourth Amendment and the Americans with Disabilities Act and state law battery and false arrest.   This court has jurisdiction over Overton's claims pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), and 1367.   Additional facts are noted below as needed, keeping in mind the standard applicable to summary judgment.

*Discussion*

I.   *Fourth Amendment Claims*

    A.   *Excessive Force*

Overton claims that Officer Hicks used excessive force in "tasing" him, that Officer Beaton used excessive force in tackling him, and that Officer Beaton failed to intervene during the tasing.  He contends that Beaton is also liable for failing to stop Officer Parker from using a police dog to attack him, both in the car and while he was lying on the ground.[2]  Defendants argue that using the dog and shocking Overton while he was in the car were reasonable steps because Overton was revving his engine and refusing to comply with commands to get out of the car.  Defendants argue that tackling Overton once he got out of the car was acceptable for three reasons:  (1) Overton had not immediately pulled over after Beaton turned on his lights and siren; (2) Beaton thought Overton might have been armed because he saw Overton fumbling with something in the front seat during the initial dog attack; and (3) Beaton thought Overton had taken a fighting stance after getting out of the car.  Defendants argue that even if the dog bites were not reasonable, Beaton did not have a realistic opportunity to intervene.

Determining whether the force used was objectively reasonable under the Fourth Amendment requires balancing the nature and quality of the intrusion on the individual's privacy rights against the government interests at stake.  See *Graham v. Connor*, 490 U.S. 386, 396 (1989).  The right to use some degree of

---

[2]Plaintiff indicated in his response brief that he had settled his claims against Officer Parker and Beech Grove and that those two defendants have been dismissed.  Pl. Br. 18 n.4.  The court has no record of such a dismissal.  Local Rule 7.1(f) requires the parties to "immediately notify the Court of any reasonably anticipated settlement of a case or the resolution of any pending motion."  A formal stipulation or motion to dismiss is needed here.

physical coercion is inherent in making an arrest or even an investigatory stop. *Id.* The question is whether the force used was excessive under the circumstances, including consideration of the "severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*

Defendants are entitled to summary judgment for the use of the dog and the taser while Overton was in his car after warning him to comply. Those actions were objectively reasonable responses to a driver who was revving the engine of a car surrounded by police. Officer Hicks reported that Overton continued to rev the car's engine even after the dog bit him. Hicks Dep. Ex. 6 at 2. Moving cars can be deadly weapons, warranting use of deadly force under certain circumstances. See *Scott v. Harris*, 550 U.S. —, 127 S. Ct. 1769, 1778-79 (2007) (reversing denial of summary judgment and finding that use of deadly force was reasonable where driver led police on "reckless, high-speed flight" for nearly ten miles); *Troupe v. Sarasota County*, 419 F.3d 1160, 1168-69 (11th Cir. 2005) (affirming summary judgment for defendants and finding that it was objectively reasonable for officer to shoot driver of stopped car surrounded by police who caused the car to move suddenly forward and backward).

There is no indication that deadly force would have been reasonable here, particularly given Officer Parker's testimony that he did not believe that Overton

could have dislodged his car from the curb. Parker Dep. 51. But some force was warranted to prevent an attempt to escape, including the reasonable use of a police dog and a taser. See *Gaddis v. Redford Township*, 364 F.3d 763, 774-75 (6th Cir. 2004) (affirming summary judgment on excessive force claim, and finding that use of pepper spray on mentally ill man was reasonable where officers believed that he was driving while intoxicated and that he wielded a knife); *Smith v. Ball State University*, 295 F.3d 763, 770-71 (7th Cir. 2002) (affirming summary judgment for defendants where officer tried to use a "knee strike" on a diabetic driver who appeared to be struggling with other officers extracting driver from car using arm-lock); *Matthews v. Jones*, 35 F.3d 1046, 1052 (6th Cir. 1994) (affirming summary judgment for defendants, and finding use of police dog to seize reckless driver who fled car and hid in woods reasonable).

This finding of reasonableness is based only on the undisputed evidence that Overton was revving his car's engine and fumbling with the steering column – before the officers had any indication that Overton might have been in diabetic shock. Had Overton merely been passively resisting the officers' commands to get out of the car and show his hands, their use of a dog and a taser would have presented a closer question. See *Chelios v. Heavener*, 520 F.3d 678, 689-90 (7th Cir. 2008) (reversing summary judgment for defendants on excessive force claim, and observing that a jury could find that plaintiff's behavior, while not "docile and cooperative," did not warrant police officer tackling him to the ground during arrest); *Casey v. City of Federal Heights*, 509 F.3d 1278 (10th Cir. 2007) (reversing

summary judgment for defendants on excessive force claim where officers had tackled and tased man accused of improperly walking out of courthouse with case file whose only resistance was to break free of an officer's arm-lock and start to walk back to courthouse with file).

Plaintiff Overton points out that the officers had available to them other, less forceful methods of pulling him out of the car, such as using an arm-lock. See Clark Dep. 13-14, 17-19.  Not only were less forceful methods available, the plaintiff continues, but Marion County Sheriff's Department Policy 227.10 required officers to exhaust reasonable alternatives or to determine that those alternatives would have been clearly ineffective before using force.  Pl. Ex. 14. Perhaps the officers violated the department's policy by not using an arm-lock or other less intrusive method, but the court's inquiry under the Fourth Amendment is whether the force used was reasonable under the circumstances, not whether it was the least forceful means possible.  See *Deering v. Reich*, 183 F.3d 645, 652 (7th Cir. 1999) (affirming defense verdict, and recognizing that a requirement that police use "all feasible alternatives" to effect an arrest "would be an impossible straightjacket on law enforcement"); *Plakas v. Drinski*, 19 F.3d 1143, 1148-49 (7th Cir. 1994) (affirming summary judgment for defendants, and observing that the "Fourth Amendment does not require officers to use the least intrusive or even less intrusive alternatives in search and seizure cases. The only test is whether what the police officers actually did was reasonable.").  Because it was reasonable for the officers to use a dog and a taser on a driver who was revving his car's

engine while surrounded by police, any issue about the application of the department's policy on arm-locks would not defeat summary judgment.

If the events occurred in the manner that Overton's evidence indicates, however, it may have been unreasonable for Officer Beaton to tackle Overton once he was standing dazed and confused outside the car.  It also may have been unreasonable for any officer to be involved in using the police dog once Overton was lying handcuffed on the ground.  Defendants have disputed that anyone used the dog after Overton left the car.  They have argued that Officer Beaton's tackle was appropriate because he thought Overton might have been armed, because Overton had not immediately pulled over after Beaton activated his lights and siren, and because Beaton believed Overton had taken a fighting stance after exiting the car.

Two of defendants' arguments are based on factual disputes that cannot be resolved in their favor on summary judgment.  Officer Beaton based his belief that Overton may have been armed on Overton's refusal to comply with demands to put his hands in the air and on Beaton's observation that Overton had been fumbling with something while sitting in the car.  The evidence is disputed about Beaton's observation that Overton had tried to grab something from the front seat during the dog's initial attack.  For purposes of summary judgment, the court must accept Officer Parker's testimony on that point that Overton fought the dog during the initial attack using only his hands.  Parker Dep. 33.  The evidence is

also disputed about Beaton's observation that Overton took a fighting stance, and the court accepts the testimony of eyewitness Messer that Overton did not take any aggressive stance after exiting the car.  Messer Aff. ¶¶ 17-18.  That leaves only Overton's refusal to pull over immediately and to put his hands in the air.

Police officers may not use force where they have "no particular reason to believe" that a person is armed or threatening.  *Ellis v. Wynalda*, 999 F.2d 243, 247 (7th Cir. 1993) (reversing district court's finding of qualified immunity).  In *Ellis*, the defendant officer was investigating a possible burglary of a pharmacy. While searching the premises, the officer found a hole in the wall through which he saw someone walking out the back door of the adjoining store.  The officer ran outside and saw a man carrying a jacket in one hand and a mesh bag in the other. The officer ordered the man to stop.  The man kept walking.  The officer followed and again ordered the man to stop.  In response, the man turned to face the officer, threw the jacket and mesh bag toward the officer, and ran away.  The officer shouted for the man to stop and then shot the man once in the lower back as he ran.  The *Ellis* court observed that it was possible that the man was armed, "as much as it is possible that every felon might be carrying a weapon," but the officer had no particular reason to believe that the man was armed, especially after the man had tossed away his "makeshift weapon."  *Id.*  Once an officer is justified in using force, he does not retain the right to use force "any time thereafter with impunity."  *Id.*  Here, while the officers were justified initially in using force against Overton, that initial justification did not continue indefinitely,

at least as a matter of law, and did not validate unreasonable assumptions about the level of danger Overton objectively presented thereafter.

The continuing use of force is permissible only if the circumstances objectively continue to warrant the use of force.  Unlike the evidence relating to the taser and the initial dog bites, Overton is not forced to rely on police testimony in describing what happened after he got out of the car.  Two bystanders observed that Overton appeared incoherent, semiconscious, and passive as he stood outside the car.  Messer Aff. ¶¶14-18; McClure Aff. ¶¶ 12-15.  There is no indication that Overton had anything in his hands or that he had any weapon within his reach.  Under such circumstances, a jury could find that Officer Beaton used excessive force in tackling Overton from behind.  Similarly, there is no indication that Overton presented any danger while lying handcuffed, face-down on the ground.  A jury could find that any use of a dog at that point was also excessive.  See *Chelios*, 520 F.3d at 689-90 (observing that a jury could find that plaintiff's behavior, while not "docile and cooperative," did not warrant police officer tackling him to the ground during arrest); *Holmes v. Village of Hoffman Estate*, 511 F.3d 673, 686 (7th Cir. 2007) (reversing summary judgment for defendants on excessive force claim, and finding triable issue where officer repeatedly ground his knee into armed robbery suspect's face after suspect was lying handcuffed on the ground);  *Payne v. Pauley*, 337 F.3d 767, 779 (7th Cir. 2003) (reversing summary judgment for defendant; where officer charged at woman and twisted her arm for a length of time during the arrest, and where she was not threatening anyone at

scene, resisting arrest, or attempting to flee, officer's conduct was objectively unreasonable).

Because Officer Parker has not moved for summary judgment and reportedly has reached a settlement with plaintiff, Overton has argued that Officer Beaton is liable for failing to stop Parker's later use of the dog.[3]  An officer can be liable for failing to intervene while another officer uses excessive force if the officer had a realistic opportunity to step in and prevent the harm from occurring.  See *Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005) (reversing summary judgment for defendants).  Whether an officer could have intervened generally is a jury question, unless no reasonable jury could find that the officer was capable of intervening.  *Id.*

---

[3]Defendants have argued that plaintiff did not explicitly state in his complaint that he intended to pursue his Fourth Amendment claim against Officer Beaton using a failure to intervene theory, and thus, is prohibited from doing so now.  The complaint clearly states plaintiff's intention to pursue his Fourth Amendment claim against "defendant officers" using a failure to intervene theory. Compl. ¶ 29.  Even if it did not, defendants misconstrue both Federal Rule of Civil Procedure 8 and *Harper v. Albert*, 400 F.3d 1052 (7th Cir. 2005).  Rule 8(a)(2) requires a plaintiff to make a short, plain statement of his claim showing that he is entitled to relief.  The rule does not require a plaintiff to spell out in the complaint every theory of liability he plans to pursue.  The Federal Rules of Civil Procedure were designed to eliminate that kind of formal pleading required at common law.  Similarly, defendants' reliance on *Harper* is not persuasive.  *Harper* dealt with the plaintiffs' attempt to base their Eighth Amendment excessive force claim on a failure to intervene theory for the first time after presenting their case-in-chief at trial.  Such a delay could easily amount to forfeiture of a theory of liability.  This case is at the summary judgment stage.  One useful aspect of motion practice is that it can separate the wheat from the chaff, giving parties an opportunity to flesh out their cases after doing discovery.  Summary judgment is an intermediate phase of the litigation process and can warrant some flexibility. See generally *McCullah v. Gadert*, 344 F.3d 655, 659 (7th Cir. 2003) (recognizing that "plaintiffs are under no obligation to plead legal theories").

Here, answering that question requires resolving a classic swearing contest. One of the few things that Overton remembers is lying on the ground and feeling something "gnawing at the back" of his pants. Overton Dep. 29-30. Hospital staff found bite marks on Overton's backside. *Id.* at 61. Officer Beaton testified that no one used the dog once Overton was on the ground. Beaton Dep. 48-49. He further stated that after handcuffing Overton, he went to his car to fill out paperwork and treat scrapes he acquired during the tackle. *Id.* at 36. Officer Parker testified that he put the dog back in his car while Officer Hicks tased Overton. Parker Dep. 36. On this record, a reasonable jury could believe Overton's testimony and could disbelieve Beaton's and Parker's testimony in finding that Beaton was sufficiently near Overton to stop the second deployment of the dog (if it occurred, which is also disputed).

In summary, Officer Hicks is entitled to summary judgment on the excessive force claim for tasing Overton. Officer Beaton is entitled to summary judgment for failing to intervene during Parker's initial use of the dog and during the tasing because those responses were reasonable, but Beaton is not entitled to summary judgment for tackling Overton or for failing to intervene during the second deployment of the dog.

Both sides have agreed that the court's resolution of the excessive force claim also controls Overton's state law battery claim against the Marion County Sheriff. Thus, the Marion County Sheriff is entitled to summary judgment for the

tasing but not for the tackle.  Beaton did not assert qualified immunity on the excessive force claim, so no further discussion of excessive force is needed.

      B.    *Post-Detention Arrest*

Overton next claims that Beaton unconstitutionally seized him by arresting him after learning that he was diabetic and had become hypoglycemic that evening.  Beaton responds that he did not know that Overton's blood sugar was so low that it might have completely negated his awareness of the evening's events.  He contends that a female paramedic told him that Overton's blood sugar was low but not "low enough that he wouldn't know what's going on."  Beaton Dep. 39.  Again, that defense presents a factual dispute.  The female paramedic who treated Overton on the scene does not remember telling any officer that Overton's blood sugar level was high enough to keep him alert and cooperative. James Aff. ¶ 11.  She stated that it would not be her "usual practice to say something like this because of patient privacy."  James Aff. ¶ 13.  A female emergency medical technician who was present but did not treat Overton does not remember if the paramedic said anything to the police about Overton's blood sugar level.  Stevens Aff. ¶¶ 4-5.  Because the summary judgment standard requires accepting the facts and making the inferences most favorable to Overton, the court accepts the paramedic's testimony as true and infers that no medical personnel told Beaton that Overton, despite his hypoglycemic condition, was capable of understanding his and others' actions.

Beaton became aware, however, that Overton was diabetic and experiencing low blood sugar.  Beaton testified that once the ambulance arrived, he knew that Overton had low blood sugar.  Beaton Dep. 37-39, 77.  In his crash report, he noted that Overton had no alcohol in his system and marked Overton as "ill."  Pl. Ex. 9 at 1, 3.  Because of his professional training, he knew that low blood sugar can cause someone to act intoxicated.  Beaton Dep. 72.  Because Beaton's sister was diabetic, he also knew that a diabetic's blood sugar level can fluctuate dramatically and very quickly.  *Id.* at 74.  A jury could reasonably infer that before the ambulance took Overton to the hospital and before Overton was booked into jail, Beaton knew that Overton's hypoglycemic condition may have negated his ability to form criminal intent.

Beaton arrested Overton for resisting arrest, violating Indiana Code § 35-44-3-3, and for fleeing the scene of an accident, violating Indiana Code § 9-26-1-2. Section 35-44-3-3 punishes the knowing or intentional resistance of or flight from an officer performing his official duties.  Section 9-26-1-2 requires drivers involved in minor car accidents to stop driving immediately, to return to the accident scene, and to exchange information with the other driver or drivers involved. Although not explicit on the face of section 9-26-1-2, Indiana courts have interpreted the statute to require knowledge of damaging another vehicle.  See *Allen v. State*, 844 N.E.2d 534, 536-37 (Ind. App. 2006) (affirming conviction for fleeing an accident scene where driver knew he collided with another car, and finding that knowledge of section 9-26-1-2 can be actual knowledge or inferred

knowledge where the driver should have known or reasonably anticipated that collision caused damage); *Washington v. State*, 565 N.E.2d 382, 384 (Ind. App. 1991) (same).

The undisputed evidence shows that until the medical personnel arrived and discovered Overton's low blood sugar, Officer Beaton had probable cause to believe that Overton had knowingly resisted arrest and had knowingly fled an accident scene.  Once Beaton knew that Overton was diabetic and had low blood sugar, however, the existence of probable cause became much more questionable and presents a triable issue.  These new facts required Officer Beaton to re-evaluate the reasonableness of his initial probable cause determination.  See *BeVier v. Hucal*, 806 F.2d 123, 128 (7th Cir. 1986) (affirming verdict for plaintiffs in section 1983 case, and observing that a "police officer may not close her or his eyes to facts that would help clarify the circumstances of an arrest" where later discovered facts dissipate earlier finding of probable cause).

Probable cause exists if "the facts and circumstances within the police officer's knowledge were sufficient to warrant a reasonable belief that the suspects had committed, were committing, or were about to commit a crime."  *Wollin v. Gondert*, 192 F.3d 616, 622 (7th Cir. 1999) (affirming summary judgment for defendants on false arrest claim where judicial officer informed the commanding officer that the suspect's behavior was criminal).  Probable cause does not require the same type of evidence needed at trial to prove each element of the offense

beyond a reasonable doubt, see *Driebel v. City of Milwaukee*, 298 F.3d 622, 645 (7th Cir. 2002), but probable cause does not exist without evidence that the defendant acted culpably, see *BeVier*, 806 F.2d at 126-28 (affirming verdict for plaintiffs in section 1983 case where officer made arrests without any evidence of culpability). Here, because a reasonable jury could find that Officer Beaton knew that Overton's hypoglycemia diminished his capacity to knowingly resist arrest and flee an accident scene, Beaton is not entitled to summary judgment on the federal false arrest claim.

Both sides have agreed that the court's resolution of the false arrest claim also controls Overton's state law false arrest claim against Beaton. Thus, Beaton is not entitled to summary judgment for the state law false arrest claim. Beaton did not assert qualified immunity on the false arrest claim, so no further discussion of false arrest is needed.

C.   *Malicious Prosecution*

Overton also claims that Officer Beaton's decision to withhold information in his probable cause affidavit, see Beaton Dep. 41-42; Probable Cause Aff., about Overton's hypoglycemia constituted malicious prosecution, violating the Fourth Amendment.[4]  At the outset, any malicious prosecution claim against a police

---

[4]Defendants argue that plaintiff waived this claim also by not specifically pleading it in his complaint. Overton clearly stated a Fourth Amendment false arrest claim in his complaint. Compl. ¶¶ 25, 30. As discussed below, the Seventh

(continued...)

officer – whether under the Fourth Amendment or under the due process clause – is analytically separate from a basic Fourth Amendment false arrest claim.  See *Wallace v. Kato*, 549 U.S. —, 127 S. Ct. 1091, 1095-96 (2007).  False arrest occurs when a police officer arrests a person without probable cause.  *Id.*  Malicious prosecution occurs later, when a police officer takes the next step and files a report wrongfully indicating that probable cause exists, triggering malicious criminal prosecution.  *Id.*

The Supreme Court has rejected malicious prosecutions claims against police officers premised on substantive due process where state law provides an adequate remedy, but the Court has left open the question whether the Fourth Amendment protects against malicious prosecution.   See *Albright v. Oliver*, 510 U.S. 266, 275-86 (1994) (plurality opinion; Ginsburg, J., concurring; Kennedy, J., concurring, joined by Thomas, J.).  The issue in *Albright* was a "very limited one" that did not encompass the Fourteenth Amendment's guarantee of procedural due process.  *Id.* at 271, 273 n.6.

Beaton argues that after *Albright*, the Seventh Circuit foreclosed all malicious prosecution claims under any constitutional provision in *Newsome v. McCabe (I)*, 256 F.3d 747 (7th Cir. 2001).  In *Newsome*, the plaintiff brought a

---

[4](…continued)
Circuit has recognized the malicious prosecution claim Overton alleges as a particular kind of false arrest claim.  See *Jones*, 856 F.2d at 994.  Overton has not forfeited any claim for malicious prosecution to the extent that he proceeds with that claim under the Fourth Amendment.

section 1983 malicious prosecution claim based on a violation of due process, any possible Fourth Amendment claim having expired some twenty years earlier. Relying on *Albright*, the *Newsome* court rejected the plaintiff's contention that substantive due process supported his malicious prosecution claim because Illinois law recognized such a claim and thus provided the plaintiff with an adequate remedy.  "If a plaintiff can establish a violation of the fourth (or any other) amendment there is nothing but confusion to be gained by calling the legal theory 'malicious prosecution'" under substantive due process.  *Id.* at 751.  The plaintiff's allegation that the police officers withheld important information from the prosecutor, however, supported a "due process claim in the original sense of that phrase" – procedural due process – that was clearly established at the time. *Id.* at 751-53, citing *Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988).

The Seventh Circuit has explicitly recognized that the Fourth Amendment protects against malicious prosecution.  In *McCullah v. Gadert*, 344 F.3d 655 (7th Cir. 2003), the plaintiff brought a malicious prosecution claim under the Fourth Amendment.  The district court dismissed the claim under Federal Rule of Civil Procedure 12(b)(6), relying on *Albright*, *Newsome*, and another substantive due process case, *Ienco v. City of Chicago*, 286 F.3d 994 (7th Cir. 2002) (reversing summary judgment for defendants on malicious prosecution claim, and remanding to allow plaintiff to amend his complaint to include procedural due process claim).  Clarifying the distinctions between malicious prosecution claims brought under due process and those brought under the Fourth Amendment, the

*McCullah* court reversed the dismissal and held that the Fourth Amendment protects against malicious prosecution, at least before arraignment.  344 F.3d at 660-61.  The *McCullah* court left the details of the claim open for the parties to develop on remand.  No readily available record of the remand proceedings exists.

Long before *McCullah* and *Newsome*, the Seventh Circuit made clear that the primary difference between a malicious prosecution claim based on procedural due process and the same claim – although labeled as a particular kind of false arrest claim – based on the Fourth Amendment is timing.  See *Jones v. City of Chicago*, 856 F.2d 985, 994-95 (7th Cir. 1988) (affirming jury verdict for plaintiff and district court's denial of qualified immunity).  It has always been clear that under the United States Constitution, a police officer may not provide false or misleading material information that triggers criminal prosecution.  "If police officers have been instrumental in the plaintiff's continued confinement or prosecution, they cannot escape liability by pointing to the decisions of prosecutors or grand jurors or magistrates to confine or prosecute him. They cannot hide behind the officials whom they have defrauded."  *Id.* at 994.  Up until the arraignment, the Fourth Amendment governs such violations.  See *Gauger v. Hendle*, 349 F.3d 354, 362-63 (7th Cir. 2003), overruled on other grounds by *Wallace v. City of Chicago*, 440 F.3d 421, 423 (7th Cir. 2006), aff'd by *Wallace v. Kato*, 549 U.S. —, 127 S. Ct. 1091 (2007).[5]  After arraignment, the due process

---

[5]In *Bishop v. City of Indianapolis*, No. 1:06-cv-1064, 2008 WL 820188, at *12-13 (S.D. Ind. March 24, 2008), Judge Barker reached the opposite result and (continued...)

clause governs malicious prosecutions.  See *Wallace v. Kato*, 127 S. Ct. at 1096; *Jones*, 856 F.2d at 994.

Whether the question is analyzed under the Fourth Amendment or procedural due process, an officer who intentionally provides false or misleading information before trial that is material to a prosecutor's decision to proceed with prosecution is not entitled to qualified immunity.  See *Newsome*, 256 F.3d at 752-53 (affirming district court's decision to deny immunity); *Jones*, 856 F.2d at 995 (same).  If warranted, Overton's damages would be limited under the Fourth Amendment to those he sustained up until his arraignment, see *Gauger*, 349 F.3d at 362-63, because he did not allege a procedural due process claim covering later harms.  Whether the Fourth Amendment malicious prosecution claim that the *McCullah* court recognized encompasses behavior beyond the scope of the "false arrest" claim discussed in *Jones* is a question for another day.  Here, following the false arrest analysis above, a jury could find that Officer Beaton intentionally withheld information that would have altered the prosecutor's decision to pursue charges against Overton.  Officer Beaton is not entitled to qualified immunity for such conduct, if plaintiff can prove it.

II.     *Americans with Disabilities Act*

---

[5](...continued)
granted summary judgment for a defendant officer on a federal constitutional claim for malicious prosecution.  Based on *Albright*, *Newsome*, *McCullah*, and *Jones*, this court respectfully disagrees for the reasons set forth above.

Finally, Overton claims that the Marion County Sheriff, based on Officer Beaton's alleged false arrest, discriminated against him under the Americans with Disabilities Act of 1990, 42 U.S.C. § 12132, because he was diabetic.  Health conditions that can be controlled generally do not qualify as disabilities under section 12132.  See *Nawrot v. CPC International*, 277 F.3d 896, 904 (7th Cir. 2002) (reversing summary judgment for defendant on disability discrimination claim). In *Nawrot*, the plaintiff claimed that his employer discriminated against him because he was a diabetic.  Citing *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 483-84 (1999) (recognizing that diabetes is not a disability under section 12132 simply because unregulated blood sugar can substantially limit major life activities), the *Nawrot* court found that diabetics are not protected under section 12132 per se, but those who have a history of blood sugar regulation problems and unpredictable episodes can be considered disabled under section 12132. 277 F.3d at 904-05; see also *Lawson v. CSX Transportation, Inc.*, 245 F.3d 916, 923-26 (7th Cir. 2001) (reversing summary judgment for defendant on disability discrimination claim where the severity of plaintiff's diabetic condition required constant vigilance and a demanding treatment regime).  Overton has not presented any evidence that his hypoglycemic episode here was anything but an aberration, so section 12132 does not cover him.  The Marion County Sheriff is entitled to summary judgment on this claim.

III.    *Expert Opinion*

The parties discussed extensively plaintiff's submission of Ernest Burwell's report drawing conclusions about Overton's excessive force and false arrest claims. Because the court found it unnecessary to rely on Burwell's report to resolve defendants' summary judgment motion, the court does not address at this stage defendants' challenge to Burwell's opinion testimony.

### Conclusion

For the foregoing reasons, summary judgment is granted for Officer Hicks and the Marion County Sheriff based on Hicks' use of the taser. Summary judgment is granted for Officer Beaton based on his alleged failure to intervene during Officer Parker's initial use of the police dog and during the tasing of Overton. Summary judgment is granted for the Marion County Sheriff on the disability discrimination claim. Summary judgment is denied for all other claims. Officer Beaton asserted qualified immunity only for the malicious prosecution claim and is not entitled to immunity for that claim, at least as a matter of law. Trial remains scheduled for July 14, 2008.

So ordered.

Date:  June 17, 2008

_DAVID F. Hamilton_

DAVID F. HAMILTON, CHIEF JUDGE
United States District Court
Southern District of Indiana

Copies to:

David Robert Brimm
WAPLES & HANGER
dbrimm@wapleshanger.com

Jaunae M. Hanger
WAPLES & HANGER
hangerj@iquest.net

Lakshmi Devi Hasanadka
LOCKE REYNOLDS LLP
lhasanadka@locke.com,psanders@locke.com

Laurel S. Judkins
LOCKE REYNOLDS LLP
ljudkins@locke.com,jredmon@locke.com

John F. Kautzman
RUCKELSHAUS ROLAND KAUTZMAN BLACKWELL & HASBROOK
jfk@rucklaw.com,hal@rucklaw.com

Jonathan Lamont Mayes
CITY OF INDIANAPOLIS, OFFICE OF CORPORATION COUNSEL
jmayes@indygov.org

Anthony W. Overholt
LOCKE REYNOLDS LLP
aoverholt@locke.com,jrudolph@locke.com

John C. Ruckelshaus
RUCKELSHAUS ROLAND KAUTZMAN BLACKWELL & HASBROOK
jcr@rucklaw.com,hal@rucklaw.com

Richard A. Waples
WAPLES & HANGER
richwaples@aol.com,jalbrecht@wapleshanger.com

Thomas E. Wheeler , II
LOCKE REYNOLDS LLP
twheeler@locke.com,kdickerson@locke.com